**STATE OF ALASKA, Plaintiff–Appellant,**

v.

**Bruce BABBITT, Secretary of the Interior, et al., Defendants–Appellees.**

**Katie JOHN, et al., Plaintiffs–Appellees,**

v.

**UNITED STATES of America, et al., Defendants–Appellants.**

Nos. 94–35480, 94–35481.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 1995.

Opinion Filed April 20, 1995.

Opinion Withdrawn Dec. 19, 1995.

Decided Dec. 19, 1995.

Joanne M. Grace, Assistant Attorney General, Anchorage, Alaska, for plaintiffs-appellants-plaintiffs-appellees.

Elizabeth Ann Peterson, United States Department of Justice, Washington, DC, for defendants-appellees-defendants-appellants.

Robert T. Anderson, Native American Rights Fund, Anchorage, Alaska, for defendant-appellee-plaintiff-appellee.

Richard L. Young, Albuquerque, New Mexico, for Peratrovich, et al., as amici curiae.

Michael A.D. Stanley, Juneau, Alaska; Marc D. Slonim, Ziontz, Chestnut, Varnell, Berley & Slonim, Seattle, Washington, for Peninsula Marketing Association, et al., as amici curiae.

Clive J. Strong, Deputy Attorney General, Boise, Idaho, for States of Arizona, California, Idaho, Montana, Nevada, and Oregon, as amici curiae.

Carol H. Daniel, Alaska Legal Services Corporation, Anchorage, Alaska, for Native Village of Quinhagak, et al., as amici curiae.

Before: WRIGHT, HALL and WIGGINS, Circuit Judges.

## ORDER

The opinion filed April 20, 1995, and published at 54 F.3d 549 (9th Cir.1995) is withdrawn. It is replaced by the opinion and dissent filed concurrently with this order.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

These appeals arise from the efforts of Katie John, Doris Charles and the other

upper Ahtna Athabaskan Indians of Mentasta Village to continue subsistence fishing at Batzulnetas as they and their ancestors have done since time immemorial.[1] The fishery at Batzulnetas lies near the confluence of Tanada Creek and the Copper River and within Wrangell–St. Elias National Park. They also involve the claim by the state of Alaska that the Secretaries of the Interior and Agriculture, on behalf of the federal government, are attempting to exercise too much control over fish and wildlife management within the state.

The Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. § 3101 et seq., requires that subsistence fishing and hunting be given a priority over other uses of fish and wildlife on "public lands." The sole issue remaining in this appeal concerns the meaning of the definition of public lands in § 102 of ANILCA. 16 U.S.C. § 3102.[2] Specifically, the parties dispute whether navigable waters fall within the statutory definition of public lands and are thus subject to federal management to implement ANILCA's subsistence priority.[3]

The district court adopted a highly expansive definition of public lands, holding that the subsistence priority applies to all Alaskan waters subject to the federal navigational servitude. We disagree. Instead, we hold that the subsistence priority applies to navigable waters in which the United States has reserved water rights. We hold also that the federal agencies that administer the subsistence priority are responsible for identifying those waters. We therefore reverse and remand to the district court for further proceedings consistent with this opinion.

## I. BACKGROUND

In 1958, Congress preserved aboriginal fishing rights in the Statehood Act. Act of July 7, 1958, Pub.L. 85–508, § 4, 72 Stat. 339. But in 1960, after assuming responsibility for fish and wildlife management, the state closed the fishery at Batzulnetas and other traditional subsistence fisheries. In 1971, Congress extinguished aboriginal fishing rights. 43 U.S.C. § 1603(b).

Congress expected that the state and the federal agencies would protect subsistence hunting and fishing. 1971 U.S.C.C.A.N. 2247, 2250. In 1980, frustrated with their failure to do so, Congress enacted ANILCA. Title VIII of ANILCA required that rural Alaska residents be accorded a priority for subsistence hunting and fishing on public lands. 16 U.S.C. §§ 3113, 3114. Pursuant to § 805(d) of ANILCA, 16 U.S.C. § 3115(d), Congress gave the state authority to implement the rural subsistence preference by enacting laws of general applicability consistent with ANILCA's operative provisions. In anticipation of ANILCA's passage, the state enacted laws consistent with Title VIII which gave rural residents a subsistence priority. In 1982, after Congress enacted ANILCA, the Secretary of the Interior certified

---

1. The following amici curiae also seek to continue subsistence fishing in particular navigable waters: the Peratrovich Plaintiffs whose ancestors fished in marine waters in the Alexander Archipelago and within the Tongass National Forest; the Tlingit, Haida and Tsimshian Indians of the Sitka Tribe whose ancestors also fished in marine waters; the Yup'ik Eskimos of the Villages of Quinhagak and Goodnews Bay whose ancestors fished at the mouths of the Kanektok and Goodnews Rivers; and the Native Alaskans of the Village of Elim and the Nome Eskimo Community whose ancestors fished along the coast of the Seward Peninsula in northern Norton Sound.

2. Another issue originally raised in this appeal was whether Title VIII of ANILCA authorizes the federal government to manage subsistence fishing and hunting on public lands in the absence of Alaska laws implementing the subsistence priority. The district court held that ANILCA does, in

fact, authorize the appropriate federal agencies to promulgate regulations if the state does not or cannot do so. After briefing was completed in this court, but before oral argument, the parties, including the state of Alaska, stipulated to the dismissal with prejudice of that issue. We accepted the stipulation.

The Alaska Legislature, angry with the Governor's directive to the Attorney General to stipulate to the dismissal, filed an emergency motion for intervention and, in the alternative, for substitution, or for stay. We denied its motion, concluding that the Legislature was not empowered under state law to intervene in the appeal.

In light of the dismissal with prejudice of that issue, the district court's holding on this issue stands.

3. As the parties do not dispute whether nonnavigable waters are public lands, we do not address that issue.

the state to manage subsistence hunting and fishing on public lands.

Congress could not have anticipated the next chain of events. In 1989, the Alaska Supreme Court struck down the state act granting the rural subsistence preference as contrary to the Alaska state constitution. *McDowell v. Alaska,* 785 P.2d 1 (Alaska 1989). It stayed its decision to give the legislature an opportunity to amend the constitution or otherwise bring its program into compliance with ANILCA. The legislature, however, failed to act during either its regular or special session.

In 1990, the federal government withdrew Alaska's certification and took over implementation of Title VIII. The Secretary of the Interior, on behalf of all concerned federal agencies, published temporary subsistence management regulations that adopted a very narrow definition of public lands, explaining that "navigable waters generally are not included within the definition of public lands." 55 Fed.Reg. 27,114, at 27,115 (June 29, 1990). The final regulations did not differ significantly. *See* 57 Fed.Reg. 22,940, at 22,942 (May 29, 1992).

Katie John and the state brought separate actions against the federal agencies; Katie John challenged the regulations that provided that public lands excluded navigable waters and the state challenged the federal government's authority to regulate in this area at all. The district court ordered these actions consolidated and that other actions raising similar issues be jointly managed.[4] After consulting with counsel for the parties in the jointly managed cases, the district court decided to address the fundamental issue of whether navigable waters are public lands before resolving other issues.[5]

Katie John argued that public lands include virtually all navigable waters, by virtue of the federal navigational servitude. The state contended that public lands exclude navigable waters. Prior to oral argument before the district court, the federal agencies agreed with the state. But at oral argument, those agencies modified their position, arguing that public lands include those navigable waters in which the federal government has an interest under the reserved water rights doctrine.

On cross-motions for summary judgment, the district court concluded that public lands include all navigable waters encompassed by the navigational servitude. Subsequently, the district court stayed its decision and certified the issue of whether public lands include navigable waters for interlocutory appeal.[6] Both the state and the federal agencies appeal.

## II. ANALYSIS

■ We consider two questions when we review an agency's construction of a statute that it administers. *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). First, we consider "whether Congress 'has directly spoken to the precise question at issue' either in the statute itself or in the legislative history." *Railway Labor Executives' Ass'n v. ICC,* 784 F.2d 959, 963 (9th Cir.1986) (quoting *Chevron,* 467 U.S. at 842, 104 S.Ct. at 2781). Second, if Congress has not directly spoken to that precise question, we consider "whether the agency's answer is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782.

■ Under ANILCA, "the term 'public lands' means land situated in Alaska which

4. The jointly managed cases include: *Kluti Kaah Native Village of Copper Ctr. v. Alaska,* No. A90–0004–CV, *Fish & Game Fund v. Alaska Bd. of Fisheries,* No. A92–0443–CV, *Peratrovich v. United States,* No. A92–0734–CV, *Native Village of Stevens v. McVee,* No. A92–0567–CV, and *Native Village of Quinhagak v. United States,* No. A93–0023–CV.

5. The district court also characterized as fundamental the issue of whether ANILCA authorizes

federal agencies to manage subsistence fishing and hunting on public lands in the absence of consistent Alaska laws. As discussed *supra* at note 2, that issue is not before us.

6. Similarly, it certified the issue of whether ANILCA authorizes federal agencies to manage subsistence fishing and hunting on public lands in the absence of consistent Alaska laws for interlocutory appeal. *But see supra* at note 2.

... are Federal lands." 16 U.S.C. § 3102(3). "The term 'Federal land' means lands the title to which is in the United States." 16 U.S.C. § 3102(2). And "[t]he term 'land' means lands, waters, and interests therein." 16 U.S.C. § 3102(1). In other words, public lands are lands, waters, and interests therein, the title to which is in the United States. *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 548 n. 15, 107 S.Ct. 1396, 1406 n. 15, 94 L.Ed.2d 542 (1987).

As noted above, the parties dispute whether navigable waters are public lands. At one extreme, the state maintains that ANILCA's definition of public lands excludes all navigable waters because the federal government does not hold title to them by virtue of the navigational servitude or the reserved water rights doctrine. At the other extreme are Katie John and amici curiae Peratrovich Plaintiffs who argue that all navigable waters are public lands. Katie John says this is so because the navigational servitude defines the scope of public lands. The Peratrovich Plaintiffs say this is so because, in ANILCA, Congress expressed its intent to exercise its Commerce Clause powers to regulate subsistence fishing in navigable waters.[7] In the middle are federal agencies contending that public lands include certain navigable waters, defined by the reserved water rights doctrine.[8]

ANILCA's language and legislative history indicate clearly that Congress spoke to the precise question of whether *some* navigable waters may be public lands. They clearly indicate that subsistence uses include subsistence fishing. *See, e.g.,* 16 U.S.C. § 3113. And subsistence fishing has traditionally taken place in navigable waters. Thus, we have no doubt that Congress intended that public lands include at least some navigable waters.[9]

Unfortunately, ANILCA's language and legislative history do not give us the clear direction necessary to find that Congress spoke to the precise question of *which* navigable waters are public lands. ANILCA itself refers only to "lands, waters, and interests therein, the title to which is in the United States." It makes no reference to navigable waters. The legislative history is also unhelpful, containing only a single reference to navigable waters. *See* 126 Cong.Rec. 20278–80 (Nov. 12, 1980) (statement of Rep. Udall). Lacking clear direction, we must decide whether the federal agencies' conclusion that public lands include some navigable waters under the reserved water rights doctrine is based on a permissible construction of the statute.

### A. Navigational Servitude

■ The navigational servitude describes the paramount interest of the United States in navigation and the navigable waters of the nation. *United States v. Certain Parcels of Land*, 666 F.2d 1236, 1238 (9th Cir.1982). It derives from the Commerce Clause. *Kaiser Aetna v. United States*, 444 U.S. 164, 177, 100 S.Ct. 383, 391–92, 62 L.Ed.2d 332 (1979). It is "a concept of power, not of property." *Certain Parcels*, 666 F.2d at 1238 (citing *United States v. Twin City Power Co.*, 350 U.S. 222, 224–25, 76 S.Ct. 259, 260–61, 100 L.Ed. 240 (1956)).

We have held that the navigational servitude is not "public land" within the meaning of ANILCA because the United States does not hold title to it. *City of Angoon v. Hodel*, 803 F.2d 1016, 1027 n. 6 (9th Cir.1986), *cert. denied*, 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987). Contrary to the district court's opinion, the Supreme Court has not limited that holding. In *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987), the Court rejected the assertion that the Outer Continental Shelf (OCS) is not "Federal land"

---

7. In addition to their Commerce Clause argument, amici curiae Peratrovich Plaintiffs join in Katie John's navigational servitude argument.

8. In addition to their navigational servitude and Commerce Clause arguments, Katie John and amici curiae Peratrovich Plaintiffs alternatively contend that the reserved water rights doctrine defines the scope of public lands.

9. Our interpretation of the term public lands in this case will not allow the United States to usurp state power over navigable waters elsewhere. ANILCA applies only to Alaska and our interpretation of its definition of public lands is necessary to give meaning to its purpose of providing an opportunity for a subsistence way of life.

because the United States does not hold title to it. *Id.* at 548 n. 15, 107 S.Ct. at 1406 n. 15. The Court explained in dictum that, while the United States may not hold "title" to the OCS, it was hesitant to conclude that the United States did not have "title" to "any interests therein." *Id.* But its dictum indicates only that, while the United States may not hold title to land, it may hold title to interests (e.g., mineral rights) in that land.

For this reason, we reject the argument that the navigational servitude is an "interest ... the title to which is in the United States," such that all navigable waters are public lands within the meaning of ANILCA.

## B. Commerce Clause

■ Neither the language nor the legislative history of ANILCA suggests that Congress intended to exercise its Commerce Clause powers over submerged lands and navigable Alaska waters. Although Congress explicitly invoked its authority under the Commerce Clause to protect and provide the opportunity for continued subsistence uses on the public lands, *see* 16 U.S.C. § 3111(4), its invocation of that authority is also consistent with an implicit reservation of waters under the reserved water rights doctrine.

Congressman Morris Udall inserted a statement in the Congressional Record that ANILCA's definition of public lands included all navigable waters throughout Alaska. *See* 126 Cong.Rec. 29260, 20278–80 (Nov. 12, 1980) (statement of Rep. Udall). He did so, however, after the Senate had passed ANILCA, after the House had finished debating it, and shortly before the House voted on it. His views deserve little weight. *See NLRB v. Fruit & Vegetable Packers & Warehousemen,* 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964) ("these statements could represent only the personal views of these legislators, since [they] were inserted in the Congressional Record after passage of the Act").

We reject the argument that Congress expressed its intent to exercise its Commerce Clause powers to regulate subsistence fishing in all Alaskan navigable waters.

## C. Reserved Water Rights

■ Under the reserved water rights doctrine, when the United States withdraws its lands from the public domain and reserves them for a federal purpose, the United States implicitly reserves appurtenant waters then unappropriated to the extent needed to accomplish the purpose of the reservation. *Cappaert v. United States,* 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976). The United States may reserve "only that amount of water necessary to fulfill the purpose of the reservation." *Id.* at 141, 96 S.Ct. at 2071. The United States' authority to reserve unappropriated waters derives from the Commerce Clause and the Property Clause. *Id.* at 138, 96 S.Ct. at 2069.

In determining whether the reserved water rights doctrine applies, we must determine whether the United States intended to reserve unappropriated waters. *Id.* at 139, 96 S.Ct. at 2069–70. Intent is inferred if those waters are necessary to accomplish the purposes for which the land was reserved. *Id.; United States v. New Mexico,* 438 U.S. 696, 702, 98 S.Ct. 3012, 3015, 57 L.Ed.2d 1052 (1978). It follows that courts must conclude that "without the water the purposes of the reservation would be entirely defeated." *Id.* at 700, 98 S.Ct. at 3014.

■ The United States has reserved vast parcels of land in Alaska for federal purposes through a myriad of statutes.[10] In doing so, it has also implicitly reserved appurtenant waters, including appurtenant navigable waters, to the extent needed to accomplish the purposes of the reservations. By virtue of its reserved water rights, the United States has interests in some navigable waters. Consequently, public lands subject to subsistence management under ANILCA include certain navigable waters.

For these reasons, we hold to be reasonable the federal agencies' conclusion that the

10. These statutes include, but are not limited to, acts reserving land for national parks, forests and wildlife preserves, the Statehood Act, the

Alaska Native Claims Settlement Act and ANILCA itself.

definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine. We also hold that the federal agencies that administer the subsistence priority are responsible for identifying those waters.

## III. CONCLUSION

We recognize that our holding may be inherently unsatisfactory. By holding that public lands include some specific navigable waters as a result of reserved water rights, we impose an extraordinary administrative burden on federal agencies. We accept a complicated regulatory scheme requiring federal and state management of navigable waters. Let us hope that the federal agencies will determine promptly which navigable waters are public lands subject to federal subsistence management. As long as federal *and* state regulation is necessary, we expect the federal agencies and the state to cooperate fully to protect and provide the opportunity for subsistence fishing in navigable waters.

If we were to adopt the state's position, that public lands exclude navigable waters, we would give meaning to the term "title" in the definition of the phrase "public lands." But we would undermine congressional intent to protect and provide the opportunity for subsistence fishing.

If we were to adopt Katie John's position, that public lands include all navigable waters, we would give federal agencies control over all such waters in Alaska. ANILCA does not support such a complete assertion of federal control and the federal agencies do not ask to have that control.

The issue raised by the parties cries out for a legislative, not a judicial, solution. If the Alaska Legislature were to amend the state constitution or otherwise comply with ANILCA's rural subsistence priority, the state could resume management of subsistence uses on public lands including navigable waters. Neither the heavy administra-

tive burden nor the complicated regulatory scheme that may result from our decision would be necessary. If Congress were to amend ANILCA, it could clarify both the definition of public lands and its intent. Only legislative action by Alaska or Congress will truly resolve the problem.

## REVERSED AND REMANDED.

CYNTHIA HOLCOMB HALL, Circuit Judge, dissenting:

### I.

The issue in this case should be a simple one to resolve: Is the fish camp located in navigable waters at the confluence of the Tanaga Creek and Copper River, in the midst of the Wrangell–St. Elias National Park, "public land" for the purposes of the Alaska National Interest Lands Conservation Act (ANILCA), 16 U.S.C. §§ 3101, et seq.? It is, unfortunately, an incredibly complex issue [1] whose resolution will impact all the navigable waters in Alaska. Because I feel that we, as judges, are not empowered to resolve this issue without direction from Congress, I dissent.

I agree with the majority that ANILCA defines "public land" as "lands, waters, and interests therein, the title to which is in the United States." Maj. op. at 701–02; 16 U.S.C. § 3102; *Amoco Production Co. v. Village of Gambell*, 480 U.S. 531, 548 n. 15, 107 S.Ct. 1396, 1406 n. 15, 94 L.Ed.2d 542 (1987).

Given this definition, this appears to be an easy case at first blush. Because the fish camp is in the midst of a National Park, the United States would seem to have title to all land and waters within the Park. 16 U.S.C. § 410hh(9) (creating Wrangell–St. Elias National Park and Preserve); S.Rep. 96–413, 1980 U.S.C.C.A.N. 5070 (noting that United States owns 7,990,000 acres of the Park). If so, the Park would be "public land" and ANILCA would apply.

---

1. In *Native Village of Quinhagak v. United States,* 35 F.3d 388, 392 (9th Cir.1994), one panel of this Circuit held that this issue—whether "public lands" includes navigable waters—presented a

"serious question" for preliminary injunction purposes. That panel has a gift for understatement.

One wrinkle in the facts of this case prevents the solution from being so simple, however: The fish camp lies in navigable waters. Under ANILCA, "public land" does not include land "validly ... granted to ... the State under any other provision of Federal Law." 16 U.S.C. § 3102(3)(A). The Submerged Lands Act of 1953 granted to the states all federal interests in the "lands beneath navigable waters." 43 U.S.C. § 1311(c) ("The United States hereby releases and relinquishes unto said States ... all right, title and interest of the United States, if any it has,. in and to all lands [beneath navigable waters], improvements, and natural resources."); *State of Alaska v. Ahtna, Inc.*, 891 F.2d 1401, 1403 (9th Cir.1989), *cert. denied*, 495 U.S. 919, 110 S.Ct. 1949, 109 L.Ed.2d 312 (1990) ("States generally hold title to the lands underlying navigable rivers within their boundaries.").[2] Alaska therefore has title to the water within and land beneath the river containing the fish camp.

2. None of the exceptions to the Submerged Lands Act apply. Section 1301(f) carves out the first exception: The definition of "lands beneath navigable waters" excludes land grants from the United States to third persons. 43 U.S.C. § 1301(f). Neither party contends that the United States deeded Alaska's navigable waters to a third party.

Section 1313 includes two more exceptions. Under the first, the United States retains ownership over "all tracts or parcels of land together with all accretions thereto" which it had reserved at the time of statehood, or which it later acquires by condemnation. 43 U.S.C. § 1313(a). Since only dry land can have accretions, *Black's Law Dictionary* 19 (5th ed. 1979) (the term accretion is "usually applied to the graduate and imperceptible accumulation of land by' natural causes"), this section does not apply to the land beneath navigable waters.

The second part of § 1313 excepts lands beneath navigable waters "held by the United States for the benefit of any tribe, band, or group of Indians or for individual Indians." 43 U.S.C. § 1313(b). Title to Alaska's navigable waters passed to Alaska at the time of its statehood, in 1959. Alaska Statehood Act, § 6(m), 72 Stat. 339, 343 (1959) ("The Submerged Lands Act of 1953 ... shall be applicable to the State of Alaska ..."). To prevent the automatic transfer of title, the United States would have to show that it was holding land for the benefit of Native Alaskans in 1959; a later reservation would not reclaim land already given away. While it is clear that the native Alaskans are considered Indians, *Alaska Pacific Fisheries v. United States*,

Given this analysis, the United States does not have "title" to the "land or water" containing the fish camp. The only way the fish camp can lie on "public land" as § 3102 defines it is if the United States has "title" to any "interest" in those navigable waters.

To me, the crucial issue is one of statutory construction: What did Congress mean by "interest"? Congress left us few bread crumbs to follow because neither the statute itself nor its voluminous legislative history defines "interest."[3] Even the general legal definition of "interest" is unavailing. *See Black's Law Dictionary* 729 (5th ed. 1979) ("The word 'interest' is used in the Restatement of Property both generally to include varying aggregates of rights, privileges, powers and immunities and distributively to mean any one of them.").

This problem of lack of definition is compounded when we consider that the definition chosen will have far-reaching implications. If "interest" is defined narrowly, to comport with the traditional property law notion of

248 U.S. 78, 89, 39 S.Ct. 40, 41–42, 63 L.Ed. 138 (1918) (applying presumption in favor of Indians to Alaskan natives), and it is probable that the Wrangell–St. Elias National Park was created in 1980 for the benefit of the Native Alaskans under ANILCA, *see* 16 U.S.C. § 410hh(9) (establishing Wrangell–St. Elias Park and referring to subsistence priorities of ANILCA), it is doubtful that the United States was holding that land for the benefit of the native Alaskans *in 1959*, 21 years before Congress expressed any intent to use the Park land to benefit Alaskan'natives. The Ninth Circuit requires greater proof of intent. *See Ahtna*, 891 F.2d at 1405–06 (refusing to conclude, under similar' language in § 4 of the Alaska Statehood Act, that the United States held land for the Alaskan natives absent express showing of an intent to do so).

3. ANILCA's legislative history and its subsequent interpretation do contain conflicting conclusions about ANILCA's application to navigable waters. *Compare* 126 Cong.Rec. 29260, 29280 (1980) (statement of Rep. Udall) ("[I]t has always been our intent to apply the subsistence preference to all fish stocks in the waters of Alaska.") *with* 57 Fed.Reg. 22,940, 22,942 (1992) (Sec. of Interior) ("Because the United States does not generally own title to the submerged lands beneath navigable waters in Alaska, the public lands definition in ANILCA and these regulations generally excludes navigable waters."). Since these *conclusions* shed no light on how Congress intended "interest" to be defined and since they conflict in any event, they are of little use to my analysis.

"interest," then ANILCA would apply only if the United States could show a property interest, such as an easement, over these waters. If, on the other hand, "interest" is defined broadly, ANILCA may apply if the United States points to any sovereign power it may have over the waters at issue. Under the first definition, few if any of Alaska's navigable waters would fall under ANILCA; under the second, nearly all would. There is far more at stake here than one fishing camp.

I agree with the majority that Congress, in order to achieve its stated purpose, must have intended *some* navigable waters to fall under ANILCA so that defining "interest" narrowly to exclude all navigable waters is probably incorrect. Maj. op. at 701–02. I also concede that ambiguities in statutes should be construed in favor of the native Alaskans. *People of Village of Gambell v. Clark*, 746 F.2d 572, 581 (9th Cir.1984) ("Ambiguities in Title VIII [of ANILCA] must be resolved in favor of the Alaska Native people."). However, I do not think it is for us to decide, on the basis of these two factors, that Congress intended "interest" to be defined so broadly so as to bring *all* of Alaska's navigable waters under ANILCA. Such a drastic change in the amount of control exercised by the federal government over all navigable waters in Alaska can only come from Congress. *See Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266–67, 99 S.Ct. 2753, 2759–60, 61 L.Ed.2d 521 (1979) (requiring clear evidence of congressional intent to change the status quo).

## II.

Even if I believed it was for us to make this choice, I do not believe that we could give effect to Congress' intent if we wanted to. None of the property doctrines currently available to us—regardless of how broadly we define "interest"—could bring Alaska's navigable waters under ANILCA.

The majority embraces the doctrine of reserved water rights when it holds that the federal government impliedly reserved rights to the navigable waters within the Wrangell–St. Elias National Park when it withdrew that Park from the public domain. Maj. op.

at 703–04; 16 U.S.C. § 410hh(9) (reserving Park but not expressly reserving navigable waters within the Park). The reserved water rights doctrine, which derives from the Commerce and Property Clauses, permits the United States impliedly to reserve the specific *quantity* of water necessary to fulfill the purpose of a federal reservation. *See Cappaert v. United States*, 426 U.S. 128, 138, 96 S.Ct. 2062, 2069, 48 L.Ed.2d 523 (1976); *United States v. New Mexico*, 438 U.S. 696, 700, 98 S.Ct. 3012, 3014, 57 L.Ed.2d 1052 (1978).

Even assuming that Congress intended to reserve Alaska's navigable waters, both the case law and this doctrine's basis in the Property Clause limit this doctrine: The federal government can only reserve waters running over land that it owns. *See Hynes v. Grimes Packing Co.*, 337 U.S. 86, 110–16, 69 S.Ct. 968, 982–86, 93 L.Ed. 1231 (1949) (implying reservation of navigational waters already owned by the United States); *Alaska Pacific Fisheries*, 248 U.S. at 87, 39 S.Ct. at 41 (same); *Cappaert*, 426 U.S. 128, 96 S.Ct. 2062 (implying reservation of nonnavigable waters owned by the United States); U.S. Const., Art IV, § 3, cl. 2 ("The Congress shall have Power to dispose of and make all needful Rules and Regulations respect the Territory or other Property *belonging to the United States.*") (emphasis added); *cf. Ahtna*, 891 F.2d at 1401–04 (rejecting claim of implied reservation of navigable waters owned by state). Because *Alaska* has title to its navigable waters under the Submerged Lands Act, the United States cannot reserve these waters. Moreover, the task of determining the exact *quantity* of water, from each body of navigable water, necessary to achieve the Congressional goal of subsistence fishing would be an administrative nightmare.

The next doctrine, the Commerce Power, is similarly inadequate. The Commerce Power is the acknowledgment that "Congress has extensive authority over this Nation's waters under the Commerce Clause." *Kaiser Aetna v. United States*, 444 U.S. 164, 173, 100 S.Ct. 383, 389, 62 L.Ed.2d 332 (1979) (citing *Gibbons v. Ogden*, 22 U.S. (9 Wheat) 1, 189, 6 L.Ed. 23 (1824)). This authority "is

as broad as the needs of commerce," *United States v. Appalachian Elec. Power Co.,* 311 U.S. 377, 426, 61 S.Ct. 291, 308, 85 L.Ed. 243 (1940).

This Power would seem to apply here. Even when Congress quitclaimed its ownership of navigable waterways in the Submerged Lands Act, it specifically retained this Power. 43 U.S.C. § 1314(a) ("The United States retains all its ... powers of regulation and control of ... navigable waters for the constitutional purposes of commerce [and] navigation."); *Douglas v. Seacoast Products, Inc.,* 431 U.S. 265, 282, 97 S.Ct. 1740, 1750–51, 52 L.Ed.2d 304 (1977). Moreover, ANILCA's partial basis in the Commerce Clause, *see* 16 U.S.C. § 3111(4), might be construed as an implicit invocation of this Power. If it were, the United States could regulate subsistence uses in these waters as an exercise of the Commerce Power.

Because it is grounded in the Commerce Clause, however, the Commerce Power must satisfy traditional Commerce Clause analysis: *Kaiser Aetna,* 444 U.S. at 174, 100 S.Ct. at 389–90 (holding that this Power is "viewed in terms of more traditional Commerce Clause analysis"). ANILCA's subsistence provisions fail this analysis. Congress can only regulate activities that have "a substantial relationship to interstate commerce" or which "substantially affect" interstate commerce. *United States v. Lopez,* —— U.S. ——, ———————, 115 S.Ct. 1624, 1629–30, 131 L.Ed.2d 626 (1995). It would be hard to argue that the priority of a handful of Alaskan natives over subsistence fishing in one river in Alaska would "substantially affect" interstate commerce. Although the natives might buy less fish from others, this would not have any noticeable effect on interstate demand for fish. Even if every rural Alaskan subsistence fished and never bought any fish, it is still unlikely that interstate commerce would be "substantially affected." *Cf. Wickard v. Filburn,* 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (finding that home consumption of wheat by every person in the United States would decrease demand for commercial wheat and would thereby defeat the purpose of the Agricultural Adjustment Act of 1938); *Katzenbach v. McClung,* 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (finding that nationwide discrimination against African–Americans harms interstate commerce). Because the impact of ANILCA's subsistence priority in Alaskan navigable waters would not "substantially affect" interstate commerce, this priority cannot be upheld under the Commerce Power.

The final doctrine that might apply, the navigational servitude, is likewise inappropriate. Like the Commerce Power, the navigational servitude is a power derived from the Commerce Clause and is not a species of property. *See City of Angoon v. Hodel,* 803 F.2d 1016, 1028 n. 6 (9th Cir.1986), *cert. denied,* 484 U.S. 870, 108 S.Ct. 197, 98 L.Ed.2d 148 (1987) ("[T]he United States does not hold title to the navigational servitude."); *United States v. Virginia Elec. & Power Co.,* 365 U.S. 624, 628, 81 S.Ct. 784, 788, 5 L.Ed.2d 838 (1961) ("The [navigational] servitude only encompasses the exercise of this federal *power.*") (emphasis added); *United States v. Twin City Power Co.,* 350 U.S. 222, 225–26, 76 S.Ct. 259, 261–62, 100 L.Ed. 240 (1956) ("The interest of the United States in the flow of a navigable stream originates in the Commerce Clause. That clause speaks in terms of power, not of property.").

Although both the navigational servitude and the Commerce Power share a common origin in the Commerce Clause, the servitude has a narrower purpose than the Power. *Boone v. United States,* 944 F.2d 1489, 1493 (9th Cir.1991) ("[T]he navigational servitude is distinct from the power to regulate navigable waters."). The navigational servitude gives the federal government, for the sole purpose of seeing that the waterways remain navigable, the power to condemn land beneath navigable waterways without compensation. *See Kaiser Aetna,* 444 U.S. at 177, 100 S.Ct. at 391–92 ("The navigational servitude ... gives rise to the authority in the Government to assure that such streams retain their capacity to serve as continuous highways for the purpose of navigation in interstate commerce."); *Boone,* 944 F.2d at 1494 (holding that the servitude "generally relieves the government from the obligation

to pay compensation for acts interfering with the ownership of riparian, littoral, or submerged lands which, if not for the fact that a waterway was involved, would require compensation under the Fifth Amendment."). Because the subsistence provisions of ANILCA do not further any navigational purpose, the servitude cannot be the basis to apply ANILCA.

Thus, we are unable to resolve this issue in this case, even if it were our place to do so.[4]

### III.

It would be much more expedient if we could write on the slate Congress has left blank. It seems fairly clear that ANILCA's objectives would be best achieved by bringing all Alaskan navigable waters under ANILCA's reach, subject to the limitation of reasonable and noncommercial subsistence use.[5]

However, Congress has not so provided. We, as judges, have been asked to decide whether Alaska or the United States has control over all of Alaska's navigable waters. This is a decision we are neither qualified to, nor in this case capable of, deciding or implementing.

I am thus compelled to conclude that the United States has had no "interest" in Alaska's navigable waters since it gave them away in 1959. Those waters, including the fishing pond at issue here, are therefore not "public land" subject to ANILCA's subsistence priorities. For this reason, I would reverse the decision of the district court and wait for Congress to make its intentions clear.

---

4. Thus, Congress will probably have to condemn these waters or take some other action sufficient to make these doctrines applicable.

5. A major objection to granting a subsistence priority to rural Alaskans is the fear that the rural Alaskans will abuse this priority and commercially exploit the fisheries to the detriment of non-rural Alaskans. This fear is misplaced, how-

ever, if ANILCA's provisions regarding the scope of the priority are strictly followed. ANILCA forbids "subsistence uses" that are "wasteful," 16 U.S.C. § 3112, and excludes from "subsistence uses" fish caught for commercial sale, 16 U.S.C. § 3113(2)(B). Thus, ANILCA already possesses safeguards against this type of abuse.